ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U S D C Atlanta

AUG 2 7 2008

JAMES N. HATTEN, Clerk
By. _____ Deputy Clerk

TIMOTHY P. BERUBE, JOHN VANIMAN,
JOHN GAMBLE, GEORGE W KING, JR.,
MILTON L. MOSS, and STEPHEN KING

Plaintiffs,

v

BRUSH WELLMAN INC., SCHMIEDE
MACHINE AND TOOL CORPORATION,
THYSSENKRUPP MATERIALS NA, INC
(d/b/a COPPER AND BRASS SALES),
ALCOA, INC., and McCANN
AEROSPACE MACHINING
CORPORATION,

Defendants,

Civil Action No.

RWS

1:08-CV-2725

## COMPLAINT FOR DAMAGES

TIMOTHY P. BERUBE, JOHN VANIMAN, JOHN GAMBLE, GEORGE W. KING, JR., MILTON L. MOSS, and STEPHEN KING, for themselves individually, file this Complaint for Damages against Defendants Brush Wellman, Inc., Schmiede Machine and Tool Corporation, Thyssenkrupp Material NA, Inc., d/b/a Copper and Brass Sales, Alcoa, Inc., and McCann Aerospace Machining Corporation, and allege

the following:

## THE PARTIES

1      Plaintiffs are Georgia residents who assert claims for personal injury arising out of their exposure to beryllium from beryllium-containing products used at the Lockheed Martin Corporation's Marietta, Georgia facility ("The Lockheed Marietta Plant").

2.      Plaintiff, TIMOTHY P. BERUBE is an adult resident domiciliary of Georgia. Mr Berube is an employee at the Lockheed Marietta Plant During his employment, Mr. Berube was exposed to respirable beryllium dust, fumes and particulate matter.

3      Plaintiff, JOHN VANIMAN is an adult resident domiciliary of Georgia Mr Vaniman is an employee at the Lockheed Marietta Plant. During his employment, Mr Vaniman was exposed to respirable beryllium dust, fumes and particulate matter.

4      Plaintiff, JOHN GAMBLE is an adult resident domiciliary of Georgia. Mr Gamble is an employee at the Lockheed Marietta Plant During his employment, Mr Gamble was exposed to respirable beryllium dust, fumes and particulate matter

5       Plaintiff, GEORGE W KING, JR is an adult resident domiciliary of Georgia. Mr King is an employee at the Lockheed Marietta Plant During his employment, Mr King was exposed to respirable beryllium dust, fumes and particulate matter.

6       Plaintiff, MILTON L MOSS is an adult resident domiciliary of Georgia. Mr. Moss is an employee at the Lockheed Marietta Plant. During his employment, Mr. Moss was exposed to respirable beryllium dust, fumes and particulate matter

7       Plaintiff, STEPHEN KING is an adult resident domiciliary of Georgia. Mr King is an employee at the Lockheed Marietta Plant. During his employment, Mr. King was exposed to respirable beryllium dust, fumes and particulate matter

8       Defendant Brush Wellman, Inc ("Brush") is a foreign corporation created under the laws of the State of Ohio with its principal place of business located at 17876 St. Claire Avenue, Cleveland, Ohio 44110 Brush regularly transacts business in the State of Georgia and in this District.

9       Defendant Schmiede Machine and Tool Corporation ("Schmiede") is a foreign corporation created under the laws of the State of Tennessee with its principal place of business located on 1865 Riley Creek Road, Tullahoma,

Tennessee 37388. Schmiede regularly transacts business in the State of Georgia and in this District.

10. Defendant Thyssenkrupp Materials NA, Inc d/b/a Copper and Brass Sales ("Copper and Brass Sales") is a foreign corporation created under the laws of the State of Michigan with its principal place of business in Detroit, Michigan. It is subject to the jurisdiction of this Court and may be served with process by serving its Registered Agent, CSC Corporation Service, at its registered office 40 Technology Park South, #200, Norcross, Georgia 30092

11. Defendant Alcoa, Inc. ("Alcoa") is a foreign corporation created under the laws of the Commonwealth of Pennsylvania. It is subject to the jurisdiction of this Court and may be served with process by serving its Registered Agent, Corporation Service Company, at its registered office CT Corporation System, 1201 Peachtree Street, N.E., Atlanta, Georgia 30361

12. Defendant McCann Aerospace Machining Corporation ("McCann") is a Georgia corporation. It is subject to the jurisdiction of this Court and may be served with process by serving its Registered Agent, John W. McCann, at its registered office, 180 Trans Tech Drive, Athens, Georgia 30601

## JURISDICTION AND VENUE

13   Subject matter jurisdiction in this matter is based upon 28 U.S.C § 1332, as there is diversity of citizenship among the parties and the amount in controversy of each and every claim exceeds seventy-five thousand dollars, exclusive of interest and costs.

14   Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

15.   These Plaintiffs have for years machined beryllium products without adequate knowledge about, or protection from, the health risks associated with beryllium, have brought an action in order to recover for the present physical injuries that they have suffered as a result of those exposures

16   Beryllium, a metal that is lighter than aluminum and stiffer than steel and is used in many military and commercial applications, is a dangerous toxin.

17.   Exposure to beryllium can cause chronic beryllium disease ("CBD"), a disease which scars the lungs and can result in a slow, painful death by suffocation. Though the disease is incurable, early detection allows for treatment that can delay and diminish its debilitating effects   CBD can develop many years after exposure

has ceased, and typically has an indolent course and an insidious onset of symptoms. Typically, CBD develops six (6) to ten (10) years after exposure has ceased, but it has been reported to occur more than thirty (30) years after exposure and as early as four (4) months after first exposure. It is characterized by a combination of symptoms including fatigue, non-productive cough, gradually progressive shortness of breath, chest pain, anorexia, weight loss, fevers, night sweats, and organ involvement. It is a granulomatous disease of the lung causing characteristic scaring of the lung.

18. There is no known "safe" level of exposure and even slight exposures are capable of producing CBD. Virtually all who become sensitized from their exposures will go on to develop CBD.

19. Brush is a principal, manufacturer, and processor of beryllium alloys and beryllium ceramics. During all relevant times to this action, Brush has engaged in the mining, milling, manufacturing, processing, compounding, converting, selling, and distributing of beryllium and beryllium-containing products. Its products have been sold to, either directly or through other manufacturers, fabricators, and distributors, and used in the Lockheed Marietta Plant.

20. Defendants Schmiede, Cooper and Brass Sales, Alcoa, McCann, were

each manufacturers, fabricators, distributors, or machiners of beryllium-containing products sold to and used at the Lockheed Marietta Plant.

21. Defendants knew or should have known that the sale to and use of beryllium-containing products at the Lockheed Marietta Plant would result in respirable beryllium dust, fumes, and particulate matter into the workplace and surrounding environment at the facility, and that as a foreseeable result, Plaintiffs and other Lockheed employees would be exposed to harmful levels of the toxic substance beryllium.

22. Defendants knew or should have known that such harmful exposure to beryllium dust, fumes, and particulate matter would result in personal injuries such as those suffered by these Plaintiffs.

23 Each of the Plaintiffs have been exposed to harmful amounts of the hazardous substance beryllium as a foreseeable, direct and proximate result of the sale and use of beryllium-containing products by the Defendants at the Lockheed Marietta Plant

24. TIMOTHY P. BERUBE has been exposed to Defendants' beryllium-containing products from the commencement of his employment at Lockheed in 2002 to the present.

25. JOHN VANIMAN has been exposed to Defendants' beryllium-containing products from the commencement of his employment at Lockheed in 1980 to the present

26. JOHN GAMBLE has been exposed to Defendants' beryllium-containing products from the commencement of his employment at Lockheed in 1967 to the present.

27 GEORGE W. KING JR has been exposed to Defendants' beryllium-containing products from the commencement of his employment at Lockheed in 1968 until 1972, and then from 1980 to the present.

28. MILTON L. MOSS has been exposed to Defendants' beryllium-containing products from the commencement of his employment at Lockheed from 1968 through 1971, and from 1980 to the present.

29. STEPHEN A. KING, who has been exposed to Defendants' beryllium-containing products from the commencement of his employment at Lockheed in 1983 to the present;

30. As a foreseeable, direct and proximate result of their exposure to the Defendants' beryllium-containing products, each of these Plaintiffs has suffered a present physical injury.

31. Each of the Plaintiffs' beryllium-related injuries have manifested themselves such that they have been detected by physical examination and/or laboratory test.

### FIRST CLAIM FOR RELIEF: NEGLIGENCE

32. The first claim for relief is negligence. The Defendants, as manufacturers, fabricators, distributors, machiners, sellers, or users of beryllium-containing products, owed a duty to the Plaintiffs as persons who reasonably and foreseeably could be affected by such products, to use reasonable care in the design, manufacture, fabrication, distribution, machining, sale, and use of such products, particularly because Defendants knew or should have known that Plaintiffs would be exposed to beryllium dust, fumes, and particulate matter and, as a result of such exposure, would suffer personal injuries, as is alleged in more detail herein

33. A duty of reasonable care owed by the Defendants must be commensurate with the risk In connection with the design, manufacture, fabrication, machining, sale, and use of products containing the hazardous substance beryllium, the duty to exercise reasonable care is the duty to use extraordinary care because of high risk of exposure to and injury from beryllium.

34. In breach of its duty of care, each of the Defendants, was negligent at least

in the following respects:

    a. In designing, manufacturing, fabricating, distributing, selling, and using beryllium-containing products, which it knew or should have known were likely to cause personal injuries to Plaintiffs;

    b. In failing to design, manufacture, fabricate, distribute, or sell the products in a manner which would avoid exposure to the hazardous substance beryllium;

    c. In failing to adequately warn or instruct Plaintiffs of the hazards of exposure to their beryllium-containing products,

    d. In distributing and selling beryllium-containing products to the Lockheed Marietta Plant despite the fact that Defendants knew or should have known that the products would result in exposure to and injury from beryllium to Plaintiffs; and

    e. In distributing and selling beryllium-containing products to the Lockheed Marietta Plant despite the fact that Defendants knew or should have known that there were inadequate engineering controls and personal protective equipment at the facility so as to prevent or reduce the exposure to beryllium.

35. As a direct, proximate, and foreseeable result of the Defendants' negligent acts and omissions, the Plaintiffs have suffered personal injuries that have manifested themselves such that they have been detected by physical examination and/or laboratory test, and are entitled to damages

## SECOND CLAIM FOR RELIEF: STRICT LIABILITY IN TORT

36. Plaintiffs assert for their second claim for relief a claim for strict liability in tort pursuant to O.C.G.A § 51-1-11, the Georgia Product Liability Statute. The Defendants were manufacturers of "personal property sold as new property directly or through a dealer" and each Plaintiff is a "person whom may use, consume, or reasonably be affected by the property" as those terms are used in the referenced product liability statute.

37. The beryllium-containing products manufactured and sold by the Defendants and used at the Lockheed Marietta Plant, were "not merchantable and reasonably suited for the use intended" as those terms are used in the statute, and were "defective" within the meaning of controlling Georgia case authority because the risk of harm from using the beryllium-containing products as intended outweighed at all relevant times the utility of using the product. The risk outweighed the utility because beryllium-containing products when used as

intended cause or are highly likely to be a substantial contributing factor in causing various personal injuries.

38. As a foreseeable, direct and proximate result of the defective condition of the beryllium-contained products sold by Defendants, Plaintiffs have suffered personal injuries and damages as set forth in more detail in above.

39. Defendants are strictly liable in tort for such injuries and damages to Plaintiffs.

## THIRD CLAIM FOR RELIEF: STRICT LIABILITY FOR ABNORMALLY DANGEROUS AND ULTRA-HAZARDOUS ACTIVITIES

40 The design, manufacture, fabrication, distribution, machining, sale, and use of products containing the hazardous substance beryllium, are abnormally dangerous and ultra-hazardous activities for which the law imposes strict liability for any injury or damage. Defendants engaged in such abnormally dangerous and ultra-hazardous activities, including the use of their beryllium-containing products at the Lockheed Marietta Plant, and, therefore, are strictly liable for any injury or damage to Plaintiffs.

41. As a direct, proximate, and foreseeable result of the Defendants engaging in such abnormally dangerous and ultra-hazardous activities, Plaintiffs were injured

and damaged as set forth in more detail herein. The Defendants are strictly liable to Plaintiffs for such injuries and damages.

## FOURTH CLAIM FOR RELIEF: FRAUDULENT CONCEALMENT AND CIVIL CONSPIRACY

## PLAINTIFFS V. BRUSH WELLMAN, INC.

42    Defendant Brush and its predecessors have fraudulently concealed the risks and dangers of beryllium-containing products and have conspired with others in the beryllium processing industry to prevent the disclosure of accurate and complete information about the risks and hazards of beryllium.

43.    Brush has known since at least 1948 that an airborne concentration of beryllium substantially below the Atomic Energy Commission's and/or Occupational Safety & Health Administration's permissible exposure level of 2 micrograms per cubic meter of air, over an eight (8) hour period, was not safe and that workers exposed to airborne concentrations of beryllium substantially below the regulatory levels could and would develop chronic beryllium disease. Notwithstanding this knowledge, Brush failed to warn and instruct the purchasers and users of its beryllium-containing products of the risks

44.    Despite the fact that Brush knew or should have known that the referenced permissible exposure level of 2 micrograms per cubic meter would not

protect workers, Brush has fraudulently claimed to users and others exposed to its beryllium products, and to government regulators and private agencies, that such airborne concentrations were safe even for the most sensitive individuals

45. Beginning at least as early as 1951, Brush along with others in the US and international beryllium processing industry, consciously co-inspired and deliberately pursued a common plan to fraudulently conceal the true hazards and risks of airborne beryllium dust from those workers who would be exposed to beryllium dust The conspiracy and the fraudulent concealment manifest in the following series of events

    a. In the 1950s, Brush cooperated with the United States Atomic Energy Commission in a program to conceal from the public and from workers the true health risks of beryllium. During this period, the conspirators agreed to advocate and implement in their own plants a "tentative" occupational safety standard (the 2 microgram standard) that they did not believe would protect all workers from disease. In furtherance of this agreement, they did not advise workers or the public of the full state of industry knowledge about the health risks of beryllium and did not tell workers or the public that the safety standards were "tentative" and left some workers at risk.

b. On December 13, 1961, Brush formed an "Industry Wide Health and Safety Committee" to control and standardize the safety information provided in the labeling and packaging of their beryllium-containing products, to conduct public relations campaigns to distribute the companies' propaganda about the hazards of beryllium, and to advocate less stringent regulatory standards. In the words of one of its members, this Committee kept the beryllium "health problem . . . under control from a public relations standpoint." Among other things, the companies began to publicly represent that since the imposition of the AEC standard, "industry experience" had proven the 2 microgram standard to be completely effective in preventing beryllium disease. They also disseminated false information to undermine an earlier scientific study that had shown that chronic beryllium disease could develop at levels far below 2 micrograms.

c. When the Environmental Protection Agency and the Occupational Safety & Health Administration were created in the early 1970s, Brush agreed to cooperate with other beryllium processors in a joint plan to persuade EPA and OSHA to adopt and reaffirm the existing Atomic Energy

Commission standards for beryllium exposure, based on false information about the health risks of beryllium. Since the initial adoption of such standards and well into the 1990s, the conspirators have continued to jointly oppose efforts to change them and agreed to coordinate the information that would be presented to the agencies, so as to perpetuate false information about the health risks of beryllium. For example, 1975 through approximately 1979, Brush and other beryllium processors agreed to jointly oppose the Occupational Health and Safety Administration's effort to impose a stricter occupational safety standard and jointly funded expert testimony that presented false and incomplete information about the health risks of beryllium disease.

d. In 1989, Brush agreed to fund and did fund (along with "such other companies as may wish to participate") a Scientific Advisory Committee to conduct industry-approved research that would counteract mounting scientific evidence that beryllium was more dangerous than the companies wished to acknowledge. The Committee remained active through the 1990s.

e. Beginning in the 1970s and up to the present, Brush retained and funded

the work of so-called scientific experts to attack and rebut the work of NIOSH and other government agencies who established that beryllium is a human carcinogen when defendants herein and their co-conspirators knew or should have known that the attack of NIOSH in establishing that beryllium is a human carcinogen was entirely without merit or basis and was intended to advance false and misleading information to the scientific, industrial hygiene and public health committee

46.  In furtherance of said conspiracy and common plan to conceal the true hazards, risks and toxicity of airborne beryllium, Brush expressly or tacitly agreed with other beryllium processors that beryllium workers and the public would not be told that those who were susceptible to beryllium would develop the disease at airborne concentrations below 2 micrograms of beryllium dust per cubic meter of air. Rather, Brush agreed to tell beryllium workers and the public, that so long as the eight (8) hour average airborne concentration of beryllium dust remained below 2 micrograms of beryllium per cubic meters of air, workers, and in turn those in neighboring communities, would be protected form developing chronic beryllium disease.

47.  Notwithstanding the fact that Brush was publicly stating that those exposed to airborne concentrations of beryllium dust were safe so long as the eight (8)

hour average airborne concentration remained below 2 micrograms of beryllium dust per cubic meter of air, Brush knew that those who were susceptible to the toxic effects of beryllium dust would develop chronic beryllium disease at airborne concentrations substantially below that which they stated were safe and protective.

48   As a result of the fraudulent concealment and civil conspiracy, Plaintiffs have suffered for injury and damages alleged herein

## FIFTH CLAIM FOR RELIEF: PUNITIVE DAMAGES AND ATTORNEY FEES

49.   Plaintiffs seek to recover punitive damages. The Defendants' actions, as alleged above, showed willful misconduct, malice, fraud, wantonness oppression, or the entire want of care which would raise the presumption of conscious indifference to the consequences within the meaning of O.C.G.A. § 51-12-5.1, the Georgia Punitive Damages Statute.

50.   Defendants are liable for punitive damages to Plaintiffs to punish them for their conduct and to deter others from engaging in similar conduct in the future. Because the Georgia punitive damages statute provides that "only one award of punitive damages may be recovered in a court in this state from a defendant for any act or omission if the cause or action arises from product liability, regardless of the

number of causes of action which may arise from such act or omission", an appropriate punitive damage award must take into account and punish the Defendants for all of the Georgians who have suffered or will suffer from injury from the beryllium-containing products

51.  The Defendants have also acted in bad faith and thus they are liable for attorneys' fees and costs in accordance with O.C.G A. § 13-6-11

Plaintiffs demand trial by jury of all claims triable as of right by a jury.

Pursuant to L R. 7.1 D NDGa I hereby certify that this document was prepared in Times New Roman font, 14 point.

Respectfully submitted, this 26th day of August, 2008

BY: _____
JAMES H. WEBB, JR.

WEBB, LINDSEY & WADE, LLC
400 Westpark Court
Suite 220
Peachtree City, Georgia 30269
Telephone: 770.631.1811
Facsimile: 770.631 1771

Of counsel:

RUBEN HONIK
STEPHAN MATANOVIC
GOLOMB & HONIK
1515 Market Street
Suite 1100
Philadelphia, Pennsylvania  19102
Telephone:  215 985.9177
Facsimile   215.985.4169